Next case is Deborah Jones et al. versus the United States, 2015, 51-48. Mr. Rasmussen, when you're ready. May it please the court. My name's Jeffrey Rasmussen. I'm an attorney for the family of Mr. Murray. Mr. Murray is deceased and also is estate. In the District Court, or the Court of Claims, we also represented the Ute Indian tribe. The Ute Indian tribe did not appeal in this particular case, and so I'm not representing them here today. The primary issue in this case, primary issues, I guess, but the primary issue is really related to the bad man clause in the tribe's treaty. Very different sort of case than what we've been hearing today, all of which goes over my head. But what we have here is something that is very difficult for any court to do, which is to say, what did that treaty mean to Ute Indians in 1868? What did it mean to them? And we have really good briefs providing analysis of how we would parse these sentences. Doesn't this statute require a criminal act? It talked about being arrested. It does not require a criminal act. But in any case, we have criminal acts here. One of the issues here is- Then don't you run into issue preclusion because of the Tenth Circuit case? And no, we do not run into issue preclusion. Thank you. We do not run into issue preclusion here. But what we've got, the statute, the bad man clause, refers to wrongs. And then it refers to criminal acts, but it's not limited to criminal acts. And this is where we need to go and not be trying to parse the sentences as attorneys would today. But the case law from this court and from the Supreme Court is very clear that what we need to do is say, what did the Ute Indians in 1868 understand here? Then from there, what this court has generally done is look back and say, what was this statute trying to remedy? And the United States has come in here repeatedly, usually after being victorious below, but come in here repeatedly and said, this statute, we don't have liability under this statute. That's what they always say. But every time, it is something different as to why they don't have liability under this statute, under this treaty provision. Can I ask you, could you have named either the federal officers that were involved in this process in Utah or the United States in the Utah action? I don't believe we could have named the United States. We did bring a- Under the Federal Tort Claims Act or no? I think what we're looking at here when we're talking about a bad man clause is- No, I wasn't talking about that. I'm going to assume that you agree that the only forum in which the bad man clause can be litigated is the Court of Federal Claims. So put that aside. Right. But whether we could have brought the officers in under a federal tort claim, I don't know. It's the second time in my life that I haven't had anticipated a question. I am not sure how we could have brought the United States in on a federal tort claim in that particular court. OK, can I ask another question? The government says in a couple of places, and there's a red brief, that if one accepts an interpretation of the bad man clause that I know you dispute, namely that it requires some sort of criminal act, then on that assumption, the only way you could prevail on your Court of Federal Claims suit is by obtaining a finding that Mr. Murray did not, in fact, shoot himself. And I did not see, at least in your gray brief, or maybe I think also in your blue brief, an argument that said, put aside whether he killed himself or was killed, we have an independent basis for a recovery under the bad man clause, like the finger in the head as a criminal violation of a Utah statute on desecration or something like that. So on the assumption of a required criminal act, does the case narrow to the question, can the Utah and Tenth Circuit determination on summary judgment that Mr. Murray killed himself and wasn't killed by somebody else, that that has to be, that that question is, could that be overturned? Right. And there's two separate parts, because there's different claims here. And the one part of it is that it would not include claims for the wholesale failure of the United States to document what happened to Mr. Murray. Well, here, let me just, there's a limited amount of time. And unfortunately, this is the one in which I have more than the usual number of different topic questions. It seems to me your primary contention, primary contention about the role of the federal officers was that they either did things like destroyed one of the two firearms, I guess with court approval, but destroyed one of the two firearms and then failed to do a bunch of things that, had they done, might have quite dramatically changed the adjudication of the question of whether Mr. Murray killed himself or was killed. Yes. And that, as a result of that, which you didn't get a chance to litigate in the Utah court, there shouldn't be issue preclusion. Yes. On issue preclusion, and that was the other part of it. So the first part is whether what we are alleging against the United States, independent of the killing of Mr. Murray, whether there are criminal acts here, failing to document the crime scene when it is part of a cover-up is a crime. It is not a failure to act. It is a crime. They did not do the things they needed to do. So that's the first part. But then the second part is, as you just mentioned, when we're dealing with a issue preclusion claim, the lower court, or the Tenth Circuit, was very clear that it was making its decision based upon the actions of the state officers. And it was saying, these federal officers were the ones that were responsible. And our view of it was that they were both responsible, because litigants have an independent duty outside of the criminal investigation. So the litigants, so the state officers had an independent duty. Are you conceding, then, the issue preclusion to the extent that the bad men you are identifying are the state officers? And the wrongful acts you are identifying are those by the state officers? Our view is that our claims against the state officers would not be precluded, but our claims against the federal officers much more easily would not be precluded. You go to the Tenth Circuit's decision, and I'll quote it later, I guess. But you go to the Tenth Circuit's decision, and they repeatedly say, look, we're only looking at these state officers. The people who had the primary responsibility here were the federal officers. So they don't make any findings against the federal officers. They don't make findings against the federal officers. They just say, to the extent that there's a claim that something more should have been done, that was within the bailiwick of the feds. Right. And that, then, should have been what would have occurred in the court below here, in the court of claims, would be for that court to say, OK, we have wholesale destruction of the evidence here. We don't have the guns. This gun that, supposedly, Mr. Murray somehow did this and shot himself in the back of the head. And I can't even do it with my finger, let alone a gun. Somehow he did that and shot himself in the back of the head. Well, if that had happened, the gun would have been covered in blood. We've got a picture. It doesn't look like it was. If he'd shot himself with his left hand, his left hand would have been covered in blood, and it wasn't. But that's a finding of another court that was affirmed. Right. But my point here is that if we had the gun that the United States did not test, the guns, both of them, which of these guns had blowback on it? Which of them had blood on it? One of those two guns had blood on it. The United States was responsible for determining that. They didn't do the test. They didn't do a test of either gun. And so we don't have that evidence. And so what the court below should have done was say, OK, we are in a different court. We are dealing with the United States. The Tenth Circuit did what it did with regard to the state officers. But shouldn't there be a spoliation sanction against the United States? Because the Tenth Circuit was very clear that they're the ones responsible. And if there was a spoliation sanction, then the result likely would have been different. If we applied the- But is spoliation a criminal act? So you're saying that if it was in furtherance of a conspiracy, that it's a criminal act. But the question is, conspiracy to cover up what? To cover up the very improper shooting or murder, as you would have said, that the state officers engaged in. But the Tenth Circuit has confirmed that there was no actual improper shooting. To cover up the facts of the case, that would make it a crime. It doesn't have to be to cover up a murder. It has to be to cover up the facts of the crime, or of what happened, so that we can have those adjudications. Destruction of evidence is a crime. It doesn't have to be. Then we can say it has to be destruction of evidence of this particular crime. Can a federal agency be bad men? Can a federal agency be bad men? You know, I think in our brief, we say they cannot be. And so I'm not going to alter from that. That's what we say in our brief. You don't need, certainly, to reach that issue in order to decide this case. You're well into your rebuttal time, which I assume you'd like to say. Yes. Thank you, Your Honor. Mr. Masonette. Mr. Masonette, right? Yes, good morning, Your Honors. James Masonette, United States, and with me at the council today was Jody Schwartz, also from the Environment and Natural Resource Division. Let me begin by acknowledging that the facts of this case are serious and tragic, and there's no doubt that Mr. Murray's death is a profound loss for his family. The now legal issue before the court, though, is whether or not Mr. Murray's family can recover for that loss under the bad men clause. And the answer is no, for two reasons. The first reason is issue preclusion. The core of this case are the claims that Mr. Murray was shot by the police, and that the police then conspired to cover that up. Is that merely the core, or is that the entirety? Well, they make other allegations of other actions, right? Federal agents fail to perform a proper investigation. Those, as opposing counsel pointed out, have not been litigated yet. Those claims don't fall within the scope of the bad men clause. Now, the core of their case, the claim that Mr. Murray was shot by the police unlawfully, if they were to. Well, here's what I guess. I mean, it seems to me there's more than a couple of things going on here. They say failure to investigate or conspiracy to not investigate is one kind of wrong, making the federal agents bad men. They also say that the state officers, including the one that they say shot Mr. Murray, was a bad man, and he committed a wrong. And we do not take the Utah litigation as determinative of that, because that litigation would have been different, had spoliation by the people they say spoliated, namely the federal agents, been litigable. It wasn't litigable. If it were litigable, they say there would have been spoliation. There might have been an adverse inference. There certainly wouldn't have been summary judgment. So no issue preclusion as to what you call the core issue, who shot Mr. Murray. Right. Well, first of all, we have to remember that the Utah District Court did look at issues of spoliation, and it did look at their claims of conspiracy. Not as to the federal officials. It said, if there's a problem, it was not the defendant's problem, namely the defendants in the Utah case. And now the United States is the defendant here, and the question is, does the allegation that the federal officials committed spoliation, even if that was not itself wronged by a bad man, undermine the case for issue preclusion, because the litigation over who shot Mr. Murray might have been very different had that spoliation not taken place or been litigable in Utah? I don't believe so, Your Honor, because fundamentally, even if issue preclusion didn't apply here, they've had a full, so you're asking whether or not, if these issues were litigated in the Court of Federal Claims. If Detective Norton actually did what they say he did, murdered Mr. Murray, shot him without cause or something, they would get to litigate, would they not, whether that is a criminal act under the bad man clause? Yes. OK. Yes, so if they succeeded on those claims, then they would be entitled to compensation under the bad man clause. Right, so the only reason they don't get to litigate that would be issue preclusion, and that turns on whether they had the kind of full and fair opportunity to litigate that issue. And I think really their only contention is, no, we didn't, because potentially very important evidence that could have changed the result on that wasn't there, and the plaintiff didn't get the benefit of that absence, because the people who made it not be there are not defendants in the case. Right, but so the Utah District Court considered issues of isolation by the state police. The full and fair opportunity part of the test for whether issue preclusion applies or not turns on whether or not the tribunal imposed significant limitations on their litigation of their claims in that court, and it didn't. And if you look at the cases that have found that a case wasn't issue precluded because the other side didn't have a full and fair opportunity to litigate the issues, there are cases like the 10th Circuit's decision in Burrell v. Armijo, where it was a tribal court, and the judge didn't explain his conclusions, and there was no court of appeals to go to. They litigated those issues in front of a Utah District Court and were heard by the 10th Circuit, and having these issues tried again by the Court of Federal Claims, whether or not evidence was lost, there's no more evidence for the Court of Federal Claims to consider. It's going to have to hear from the same witnesses who read the same evidence. Right, but in the Court of Federal Claims, the tribunal might be entitled to say, there is potentially crucial missing evidence. These defendants, or the United States, or the agents of the United States, are responsible for it. When that happens in a case, there are a variety of spoliation remedies, adverse inference permissive or compelled, directing a verdict on an issue, a number of things where they might actually be able to prevail in the absence of evidence that is determined to have had a serious potential to have mattered. Well, I don't think anything less than an adverse inference or a directed decision would get them anywhere, because there's, as I've said, no further evidence to review. I don't know that the allegations they've made of the conduct of the federal agents here rises to the level where they could show that there were. But that hasn't been litigated, right? No. The Court of Federal Claims did not say, even if everything they say about the federal agents is true, that wouldn't be spoliation, or it wouldn't generate a possibility, a real possibility of the kind of remedy that trial courts give when there is spoliation, any of those potential remedies. Yes. Although, of course, the standards for those sorts of remedies are very high. But those issues were not litigated. What about other issues that weren't litigated, even as to the state officers? I don't see anything in the Tenth Circuit decision that addresses what they would say, what they characterize as essentially filing a corpse. I mean, they argue that, in fact, these officers, even if you accept the proposition that they didn't kill this man, that they abused his body after the fact. Right. Why wouldn't that be a crime? Well, whether it's a crime or not, it didn't occur on the reservation. And the Bad Men Clause has three elements that they have to satisfy. It has to be an affirmative act, it has to be a criminal act, and it has to have occurred on the reservation. You know, I understand the distinction between something that started off the reservation, ends off the reservation. But to have something that is a continuum, that begins on the reservation, that the heart of the activity is on the reservation, and it just simply, because the morgue happens to be off the reservation, that you somehow draw a line, that it's not. But this activity didn't, I mean, the incident, of course, began on the reservation. But whatever happened in the mortuary, that didn't begin on the reservation. Those attacks occurred entirely independently inside the mortuary, off the reservation. But I guess I'm having a hard time with your entirely independently concept. I mean, it is a continuum of activity. These are the same officers that engaged in the arrest and seizure, or attempted seizure, and ultimately then were in charge of his body. Well, I can only say that to date, in none of the case laws, the court adopted that kind of a, let's call it a nexus, sort of theory of the bad men clause. In the past, the cases where this court, or the Court of Federal Claims, has awarded compensation of bad men clause, have all been for crimes like murder and assault, that were committed by a non-Indian on an Indian on the reservation. But we've never said that you have to draw a bright line that is not necessarily consistent with logic. Well, certainly the court has held that. We have never held that activity that if some portion of it ends off the reservation, that we have to draw a line the minute that they leave the reservation. No, you haven't reached that whole thing. I'm not sure that I can see that this activity began on the reservation, and somehow, whatever happened with Mr. Empery's body didn't really begin on the reservation. But, uh, While we're talking a little bit about locations, since it's your position that the bad men clause applies only to criminal acts, one needs some sort of body of law to refer to as to what's criminal. Do you rely on, what is it, 18 U.S.A. 1152, the Indian country, the one that says the general criminal laws of the United States apply in Indian country, which I think has also been held to include the Assimilative Crimes Act, and therefore state. Well, where do you get this criminal law? Is it what, I mean, it's not, I assume it's not what, I guess we never actually had common law crime at the federal level, but is it federal criminal law through the Indian Country Crimes Act? It's not, to be perfectly honest, Your Honor, it's not an issue we briefed, as far as I know, that, I mean, what you're saying makes sense to me, but whether there would be some other world of criminal activity that would be encompassed in that term, in the sense that the Indians or the United States met at the time the treaty was signed is not an issue I'd consider. The Ute Reservation, well, the Indian Country Crimes Act, I think dates back to the first Congress or something, so the Utah, the Ute Reservation is Indian country, as far as you know? Yes. Okay. With respect to the question of the criminal acts, even if you accept the proposition that we need to talk about a criminal act, and I concede that there are not a lot of criminal acts that arise out of omission, there are some. Right. And I don't understand where the Court of Federal Claims has gotten this notion that the criminal act has to be an affirmative act in addition to being criminal. Well, I think they've gotten it from the plain language of the treaty, which says commit a wrong. That is an act of commission, not an act of omission. But whether or not there's some world of criminal omissions that might fall within the bad man clause isn't really an issue that's before the court today. Maybe there are. That's not an issue that's really been tested. In the past, as I've said, you've had cases involving murder, death, and assault that were clearly affirmative acts. Here, the problem isn't just whether or not it's an affirmative act. It's that you have those three elements, and when you set aside their core claims about Mr. Murray's death and his alleged murder, and you set aside for a moment the possibility of an adverse inference, then what you're left with are allegations about negligent acts or failures to act. And those don't, they're not just not affirmative acts. They're not criminal acts, and many of them didn't occur on the reservation. So it's not just that they can't show that these aren't affirmative acts. So for example, if you take the .380 pistol, which is at the center of the case, Agent Ashdown took possession of that pistol at the scene, and then he secured it, and then he retired, and then his successor was involved in a prosecution of the straw purchaser that had bought that pistol. And then as a result of that prosecution, the pistol was forfeited and ultimately destroyed. So. And that straw purchase prosecution was a federal or a state prosecution? A federal. Okay. And did the U.S. Attorney or the federal prosecutors tell the judge that this was a piece of potentially important evidence in a civil case? I don't know the answer to that question. I know at the time, they had not received the notice from Mr. Murray's family that they were intending to sue, which Mr. Murray's family had sent to the state and local police and not the FBI. Now, whether they should have known is one of the issues that was not litigated. So the question is, what parts of this occurred on the reservation? Mr. Ashdown, Agent Ashdown's failure to take, failure to investigate things, occurred on the reservation, but that's not an affirmative act. It's not just not an affirmative act, it's not a criminal act. So then we have the destruction of the gun. That didn't occur on the reservation. It's not a criminal act. It was an affirmative act. Well, it's a criminal act if it's part of a cover-up. Well, if it's part of a cover-up. So they've alleged, there's a lot of allegations in their briefs that are somewhat vague. I mean, the Utah District Court did look at the allegations that there was a conspiracy here. It found that there were no conspiratorial acts between the state and local police. The FBI and other federal agents weren't on the scene at the time of the shooting. They arrived after Mr. Murray's body had already left the scene. So it's not clear to me what conspiracy FBI Agent Ashdown could have engaged in just by securing the gun but failing to test it. What this all sounds like to me, Your Honor, these are allegations of negligent acts and wrongful omissions. This sounds like a Federal Tort Claims Act claim. This all fits very... Could they have brought that there? Well, it fits very badly in the Badman Claims. It fits, it sounds like negligence or a wrongful omission by a federal employee. They did bring Federal Tort Claim Act claims down. But I mean, for purposes of issue preclusion, it's not a question of what you could have asserted. It's a question of what was actually litigated, right? So, well, I'll tell you. So they brought Federal Tort Claim Act claims. Well, you can say yes or no first to that question. Yes, yes. Okay, thank you. And I was just gonna give you the background, which is that the Department of the Interior, those claims were brought a while ago and they were denied in an administrative determination by the Department of the Interior. And Mr. Murray's family didn't appeal those. And I have to tell you that I do not know, we've been trying to run down all the documents related to this, but since it wasn't directly front and center in this case, I don't know the exact scope of those claims. And I don't know whether or not, based on these allegations, there's, you know, whether there are further Federal Tort Claims Act claims they could bring at this point. They may be just, having not appealed it, it may all be time barred at this point, but. As long as we're talking about the word tort, I have a question. Yes. What's the relation between the Tucker Act jurisdiction, which I gather is the jurisdictional grant under which the Bad Men Clause claim has been brought, and the final words of the Tucker Act claims not sounding in tort? Right, well, I mean, as I understand it, and the Court's been through this since long discussions, the Bad Men Clause is that because these, because the Bad Men claims run through treaty, it doesn't fall within the tort part of the second part of the Tucker Act, right? It's a contract kind of a claim. And this is one of the rare set of claims that can be brought by individual Indians. And we would agree that the federal agency can't be a bad man. I'd like to point out that opposing counsel has, he has noted, the tribe is not part of this appeal, which we believe, in addition to the other reasons set in our briefs, is also fatal to their breach of trust claims. And so at the end of the day, Your Honor, we think that the core of their claims are barred by issue preclusion. The remaining claims simply don't fall within the Bad Men Clause. And for all those reasons, the Court of Federal Claims decision should be affirmed. Thank you, Mr. Masonette. Mr. Rasmussen has almost three minutes for a vote. Thank you. Regarding issue preclusion, I wanted to quote from the Tenth Circuit's decision. On page 581, the court says, once Agent Ashdown, the federal agent, once Agent Ashdown arrived, the FBI had exclusive jurisdiction over the investigation and was entirely responsible for preserving the .380 caliber weapon as evidence and preventing its ultimate destruction. That's one of the things the Tenth Circuit said. Then they went on and said, even if insufficient examination of Norton's gun may have prejudice plaintiffs, the district court did not abuse its discretion in finding that none of the defendants here had a duty to preserve it. The person with the most obvious responsibility for preserving that evidence, Agent Ashdown and Chief Jensen, are not parties to this litigation and therefore cannot be the subject of sanctions. That's why they didn't impose spoliation sanctions. Even though it was pretty clear there was substantial destruction of the evidence. What we have then is a case where in this court and in the court of claims, it can impose significant spoliation sanctions  And that would change the result. And that is something that the United States did a very good job in their briefs of discussing the Utah court saying, Mr. Murray killed himself, and then spoliation sanctions don't apply. But then in their brief, they then keep coming back to that and each time being a little stronger until they say that they've said that spoliation sanctions didn't apply to the United States. Tenth Circuit did not say that. They, in fact, pretty clearly indicated the exact opposite, that if there's spoliation sanctions, that would be for the court that is dealing with the United States, which was the court of claims. The spoliation sanctions then would have changed many of the things in this case, would have potentially given us the ability to prove the criminal acts, would have given us the ability, we believe, to prove acts that come within the bad man clauses. I may be arguing against all three of you, but we would ask that you look carefully at what did this mean to people on the reservation in 1868. We don't believe it is limited to criminal acts. In fact, almost no crimes were ever prosecuted against Native Americans at this point in time. The bad man clause came out of the 1864 massacre of Native Americans. No one was prosecuted for those. When you say it doesn't relate to criminal acts, you've got both the arrested and punished language, but you also have the reference to under the laws of the United States. Most civil torts, other than something under the Federal Tort Claims Act, are state law, are governed by state law, correct? Yes. So what civil action would arise under the laws of the United States? The treaty is a law of the United States, and it's using a non-legal term, very vague terms about bad men. And that's what it's talking about. And when we looked at the purpose of it, it is to say to Indians, don't go and do something yourself. Let us take care of it. We will compensate you. I don't see any reason that that would then be limited to criminal actions. It's limited to things that are wrong, that the Indians at that time would have seen as wrong. And there were plenty of those going on that were not crimes, or that were never prosecuted as crimes. And we believe that would include torts. It was wrongs that they agreed to compensate for. And it was wrongs, as the tribe and its members at that time would have understood. Thank you, counsel. Thank you. I think we have your argument. We'll take the case on revision.